Date signed July 30, 2007



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MARYLAND
#### at GREENBELT

| | | |
|---|---|---|
| In Re: | * | |
| Dorothy Whitney, | * | Case No.  06-14435-TJC |
| | * | Chapter   13 |
| Debtor. | * | |
| ************************************** | * | |
| Dorothy Whitney, | * | |
| James Whitney, | * | |
| Timothy P. Branigan, Chapter 13 Trustee, | * | |
| Plaintiffs, | * | Adv. No.  06-1597 |
| vs. | * | |
| Michael Newman, | * | |
| | * | |
| | * | |
| Defendant. | * | |

### <u>MEMORANDUM OPINION</u>

This action arises out of a complaint to set aside a fraudulent transfer filed by

Plaintiffs Dorothy and James Whitney (the "Whitneys") and Timothy P. Branigan,

Chapter 13 Trustee (the "Trustee") (the Whitneys and the Trustee are collectively

referred to herein as the "Plaintiffs"). The Plaintiffs contend that the Whitneys' transfer

of their home to the Defendant Michael Newman (the "Defendant"), should be avoided as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).[1]  The Whitneys also contend that the Defendant committed fraud by, among other things, misrepresenting the nature of the transaction that resulted in the transfer of the home.  The Defendant filed an answer to the complaint denying the allegations.

The Court held a trial on the complaint on May 30, 2007, after which the parties submitted post-trial briefs.  For the reasons set forth in this memorandum opinion, the Court will enter a judgment in favor of Plaintiffs and against Defendant avoiding the transfer of the Property but dismissing the Plaintiffs' claim for fraud.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).  The following constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

The debtor, Dorothy Whitney, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on July 27, 2006.  Thereafter, the Trustee was appointed to serve as the Chapter 13 Trustee in the debtor's case and continues to serve as the Chapter 13 Trustee.

Prior to March 2, 2005, the Whitneys were the owners of improved real property located at 13504 Leesburg Place, Upper Marlboro, Maryland 20774 (the "Property"). The Property served as the Whitneys' residence at that time and at all times through the

---

[1] The Whitneys also contend in Counts 2 and 3 that the transfer is avoidable as a fraudulent transfer under §15-204 and §15-207 of the Commercial Law Article of the annotated Code of Maryland.  Because the Court finds and concludes that the transfer was a fraudulent transfer under 11 U.S.C. § 548(a), the Court does not address Counts 2 and 3.

date of the trial.  The Whitneys fell behind on their mortgage payments and, as a result, a foreclosure action was docketed against the Whitneys in the Circuit Court for Prince George's County, Maryland.   The foreclosure case was styled as <u>John S. Burson, et al. v. James F. Whitney and Dorothy B. Whitney</u>, CAE05-2613.

The Whitneys searched for a way to save the Property from foreclosure.  The Whitneys knew that they needed approximately $11,000 in order to cure the defaults on the first deed of trust and reinstate the mortgage.  They came into contact with the Defendant after they contacted Providence Mortgage about a potential refinance.

The Defendant met with the Whitneys at the Property on the evening before the foreclosure.  The Defendant left overnight with the Whitneys unsigned copies of the following documents: (1) a quitclaim deed reflecting that the Whitneys would quitclaim the Property to the Defendant for $32,000; (2) a quitclaim bill of sale to the same effect; and; (3) a promissory note in the amount of $32,000.   Mrs. Whitney asked the Defendant why the promissory note was in the amount of $32,000 when the approximate amount to cure the default was $11,000.  The Defendant replied that the difference was his fee to undertake the transaction and to advance the funds.  Later that evening, Dorothy Whitney contacted the Defendant and told him that the Whitneys wanted to go forward with the proposed transaction.

The Defendant makes much of the fact that a foreclosure sale was scheduled for March 2, 2005, and the Whitneys had no set solution to resolve the problem.  However, as Mr. Whitney astutely testified, "people do what they must" (or words to that effect).  Having viewed Mr. Whitney's demeanor and resolve, the Court finds that the Whitneys

3

would have taken some alternative action to save their home in the event the transaction with the Defendant did not occur.

The next day, March 2, 2005, the Defendant and the Whitneys met at the courthouse prior to the scheduled foreclosure sale.  There, the Whitneys executed the following documents, all dated March 2, 2005: (1) a deed conveying the Property to the Defendant and reciting consideration for the conveyance in the amount of $157,000 (the "Deed"); (2) a promissory note from the Whitneys payable to the order of the Defendant in the amount of $32,000 (the "Note"); (3) a quitclaim deed quitclaiming the Whitneys interest in the Property to the Defendant and reciting consideration for the conveyance in the amount of $32,000; and (4) a quitclaim bill of sale conveying to the Defendant the rights, title and interest held by the Whitneys subject to prior liens and encumbrances.

Notwithstanding the plain language of the Deed, the quitclaim bill of sale, and the quitclaim deed which purported to transfer the Property to the Defendant, the parties testified that they believed they were entering into a financing transaction.  The Defendant testified that he believed that he was lending the Whitneys funds necessary to reinstate the mortgage and stop a foreclosure sale so that the Whitneys would have sufficient time to refinance the Property.  He testified that he had the Whitneys sign the Deed (which did not refer to the Note or state that the Deed was being granted to serve as collateral security for the Note) because that was the only way he knew how to document the transaction.

Similarly, the Whitneys believed that the Defendant was advancing them a loan in order to save the Property from foreclosure and allow them sufficient time to refinance the Property.  While the Note does not specify a due date, the Whitneys expected to repay

the Defendant at the time the Property was refinanced from the proceeds of the refinancing.  As the nature of the transaction is a mixed question of law and fact, the Court addresses the nature of the transaction further in the Conclusions of Law.

The Defendant learned that the amount needed to stop the sale and cure the arrearage that was owed on the first deed of trust loan against the Property was $11,174.58.  He delivered a check in that amount to the law firm that was conducting the foreclosure sale. The foreclosure sale was then cancelled.

The Whitneys continued to reside in the Property after they executed the Deed, Note and other documents.  They were not relieved of their mortgage obligation and continued to make the payments on the first deed of trust loan against the Property (although, as described below, the Defendant made the April, 2005, deed of trust payment in connection with stopping the foreclosure sale).

After the transaction with the Defendant, the Whitneys continued their effort to refinance the Property and repay the Defendant.  The Whitneys apparently were unable to refinance the Property prior to November of 2005.  Additionally, the Whitneys made no payments to the Defendant on the Note.

Defendant spoke to the Whitneys in the middle of March, 2005, and did not speak to them again before he recorded the Deed.  On November 4, 2005, without prior demand or notice of any kind, the Defendant recorded the Deed.  After recording the Deed, he did not inform the Whitneys that he had done so or send them notice of the recordation. They found out the Defendant had recorded the Deed when they were so informed during their efforts to refinance the Property.

Defendant provided no other services to the Whitneys and advanced no other monies directly to the Whitneys.  In addition to paying $11,174.58 to stop the foreclosure sale, the Defendant paid the following amounts in connection with the Property after March 2, 2005:

| | |
|---|---|
| $1,501.11 | April, 2005 payment on first deed of trust loan |
| $1,602.00 | Payment to homeowners' association |
| $1,395.00 | Payment of property taxes |
| $3,700.00 | Recording and filing fee |
| $ 426.40 | Payment of water and sewage bill |

The parties stipulate that the fair market value of the Property was $250,000 in March, 2005, and $315,000 in November, 2005.  The parties further stipulate that the Property was encumbered by liens totaling $190,000 on March 2, 2005 (the "Liens")

The parties also stipulate that the Whitneys were insolvent during all periods relevant in this adversary proceeding.

## CONCLUSIONS OF LAW

**A.    The Transfer of the Property was a Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B).**

In Count I of the Amended Complaint, the Plaintiffs seek a determination that the transfer of the Property to Defendant was a fraudulent transfer under 11 U.S.C. §548(a)(1)(B).

The parties do not agree on the characterization of the transaction between the Whitneys and the Defendant.  The Plaintiffs' litigation position is that the transaction was a sale, and the date of transfer for purposes of Section 548 analysis was November 4, 2005, the date the Defendant recorded the Deed.  The Defendant's litigation position is

that the transaction was a "sale of equity with an option to repurchase" as of March, 2005.[2] At trial, both Mr. Whitney and the Defendant testified that they believed the transaction was a loan from the Defendant to the Whitneys secured by the Property.

It is understandable why both parties' litigation position (presumably developed by counsel) differs from the parties own testimony on the nature of the transaction. The transaction is neither fish nor fowl. The Deed, the quitclaim deed and the bill of sale all reflected that the transfer was absolute on its face, and nothing states that the transfer documents were given as collateral security for a loan by the Defendant to the Whitneys.[3] On the other hand, the Whitneys signed the Note, which obviously is inconsistent with a sale transaction, and both Mr. Whitney and the Defendant testified that they believed the transaction was a loan transaction. The Note was in the amount of $32,000, although at the time the Note was made the Defendant only advanced $11,174.58, and never came close to advancing $32,000. The Note contained no maturity date or interest rate. The Defendant certainly did not act like a lender after the transaction – he never sent a notice of default or demand letter, and he had no contact with his "borrower" after the transaction other than one conversation in mid-March, 2005. He recorded the Deed without providing notice of any kind.

The Court finds and concludes that it need not, and cannot, determine whether the transaction was a sale or a loan. The documentation is simply incomprehensible on this point. Nevertheless, whether the transaction is considered to be a sale or a loan

---

[2] Defendant's Post Trial Memorandum of Law, Docket 66 at p. 1. Because there was no factual basis whatsoever in the record for the Court to find or conclude that the Defendant gave the Whitneys an option to repurchase the Property, the Court will not address the transaction as if an option was granted.

[3] The Deed recited consideration of $157,000, while the quitclaim deed recited consideration of $32,000. Candidly speaking, neither of these amounts has any valid economic justification in the record.

transaction, the transfer to the Defendant is avoidable as a fraudulent transfer under Section 548(a)(1)(B).

Section 548(a)(1)(B) of the Bankruptcy Code is a constructive fraudulent transfer provision.  It provides:

> (a)(1)   The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
>
> ******************************
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;...

11 U.S.C. § 548.  As noted above, the parties stipulate that the Whitneys were insolvent at the time of the transfer.  The only issues in dispute that are pertinent to the claim under Section 548 are when the transfer was made and whether the Whitneys received reasonably equivalent value for the transfer.

**1.      The date of the transfer.**

One of the primary disputes between the parties is the date of the transfer for purposes of determining whether a fraudulent transfer occurred under Section 548.  The Defendant contends that the date of the transfer was March 2, 2005, because that is the date the Deed was signed by the Whitneys.  The Plaintiffs contend that the date of the transfer was November 4, 2005, because that is the date the Deed was recorded.

Section 548(d)(1) provides:

> (d)(1)    For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected

> cannot acquire an interest in the property transferred that is superior
> to the interest in such property of the transferee, but if such transfer is
> not so perfected before the commencement of the case, such transfer is
> made immediately before the date of the filing of the petition.

Under Maryland law, a transfer of real estate "is so perfected that a bona fide purchaser from the debtor . . . cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee..." at the time the transferee's deed is recorded. Md. Code Ann. Real Prop. § 3-203. [4] Accordingly, the Court finds and concludes that, for purposes of determining whether a fraudulent transfer occurred in this case under Section 548, the date of transfer is November 4, 2005, the date the Deed was recorded.

Defendant further contends that the Plaintiffs are collaterally estopped to claim that the date of the transfer was November 4, 2005 because the District Court for Montgomery County, Maryland (the "District Court") previously determined that the effective date of the transfer was March 2, 2005, in litigation between the parties. The Defendant submitted into the record without objection a transcript of a hearing in the District Court, [5] which was apparently a transcript of a hearing on the Defendant's ejectment action of the Whitneys from the Property after the Defendant recorded the

---

[4] Md. Code Ann. Real Prop. 3-203 provides:

> Every recorded deed or other instrument takes effect from its effective
> date as against the grantee of any deed executed and delivered
> subsequent to the effective date, unless the grantee of the subsequent
> deed has:
>   (1) Accepted delivery of the deed or other instrument:
>     (i) In good faith;
>     (ii) Without constructive notice under § 3-202; and
>     (iii) For a good and valuable consideration; and
>   (2) Recorded the deed first.

[5] The only date on the transcript is May 29, 2007, which the parties stipulated was the date it was printed.

Deed. The District Court ruled that, for purposes of determining whether the Homeowners Foreclosure Act applied to the transaction, the date the "transaction occurred" was the date of the Deed, March 2, 2005, rather than the date of recordation, because Md. Code Ann. Real Prop. § 3-201[6] provides that the effective date of a deed is the date it is delivered. See Transcript at p.19-20.

Collateral estoppel does not apply to the District Court's ruling.[7] The issue resolved by the District Court is not the same issue as that before this Court. As it appears from the transcript, the issue before the District Court was whether the recently enacted Homeowners Foreclosure Act applied to the transaction. That act was enacted in May, 2005, and has an effective date of October 1, 2005, both of which dates are between the date of the execution of the Deed and the date of the recording of the Deed in this case. As stated above, the District Court ruled that the date the "transaction occurred" was the date of the Deed, March 2, 2005, rather than the date of recordation, because Md. Code Ann. Real Prop. § 3-201 provides that the effective date of a deed is the date it is delivered. See Transcript at p.19-20. The District Court's ruling was expressly limited to

---

[6] Md. Code Ann. Real Prop. § 3-201 provides:

> The effective date of a deed is the date of delivery, and the date of delivery is presumed to be the date of the last acknowledgment, if any, or the date stated on the deed, whichever is later. Every deed, when recorded, takes effect from its effective date as against the grantor, his personal representatives, every purchaser with notice of the deed, and every creditor of the grantor with or without notice.

[7] Although neither party cited the Court to any authority on the issue of collateral estoppel, it is well established in Maryland that in order for collateral estoppel to apply, a party must show that: (1) the issue decided in the prior adjudication is identical with the one presented in the action in question; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom the plea is asserted is a party or is in privity with a party to the prior adjudication; (4) the party against whom the plea is asserted was given a fair opportunity to be heard on the issue. See Colandrea v. Wilde Lake Community Ass'n, 361 Md. 371, 391 (Md. 2000). See also, Allen v McCurry, 449 U.S. 90, 96 (1980). ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the state from which the judgments emerged would do so,…")

a determination of whether the Homeowners Foreclosure Act applied to the transaction in light of that act's effective date.[8]

The issue before this Court differs markedly from the issue before the District Court.  Here, the issue is what is the date of the transfer for purposes of 11 U.S.C. § 548. As noted above, Section 548(d) expressly provides when a transfer is made.   This definition is an explicit and unambiguous statutory term and differs from the general definition of "transfer" under the Bankruptcy Code.  See 11 U.S.C. § 101(54).  Thus, the District Court's determination of the date of a transaction for purposes of determining the applicability of a state law statute has no bearing on when a transfer is made for purposes of Section 548, which provides expressly when a transfer is made for its purposes. Thus the issue presented in this case is not identical with the issue adjudicated by the District Court.  See Colandrea v. Wilde Lake Community Ass'n, 361 Md. 371, 391 (Md. 2000). Accordingly, the Court finds and concludes that, for purposes of the analysis under Section 548, the transfer of the Property occurred on November 4, 2005, the date that the Defendant recorded the Deed.

**2.      Reasonably equivalent value.**

Under Section 548(a)(1)(B)(i), a transfer can only be avoided if the debtor "received less than reasonably equivalent value for such transfer…"  For purposes of Section 548, "…value means property, or satisfaction or securing of a present or antecedent debt of the debtor…" 11 U.S.C. § 548(d)(2)(A).  "[R]easonably equivalent value looks to the consideration actually received by the debtor, not to the value given by the transferee."  Koch v. Rogers (in re Broumas), 203 B.R. 385, 393 (D. Md. 1996)

---

[8] The District Court expressly stated it was not ruling on whether the transaction was subject to challenge, and indeed, stated it had no jurisdiction to do so. See Transcript at p. 19-21.

(citing Harman v. American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 484 (4th Cir. 1992)).

In order to determine whether the debtor received reasonably equivalent value for the transfer, the Court must compare the value of the consideration received by the debtor with the value of the property transferred by the debtor.  BFP v. Resolution Trust Corp., 511 U.S. 531, 546 (1994) ("There is no doubt that this provision [11 U.S.C. § 548(a)(1)(B)] directs an inquiry into the relationship of the value received by the debtor to the worth of the property transferred.")  Reasonable equivalence is to be determined as of the date of the transfer.  In re Morris Communications NC, Inc, 914 F.2d 458, 466 (4th Cir. 1990).  "[R]easonable equivalence is not wholly synonymous with market value even though market value is an extremely important factor to be used in the Courts assessment of reasonable equivalence."  Id.  The determination of whether reasonably equivalent value was received requires a case by case analysis taking into account the good faith of the transferee and whether the sale was "an arms length transaction between a willing buyer and a willing seller."  Id.

### a.  The transaction as a sale transaction.

Treating the transaction as a sale transaction, the parties stipulated that: (1) the fair market value of the Property on November 4, 2005 was $315,000; and (2) the amount of the existing deed of trust loans secured by the Property on November 4, 2005 was $190,000.  Therefore, the Whitneys' equity in the Property at the time of transfer was $125,000.  It is also uncontested that the Defendant did not assume the existing loans, but took title subject to them.  Thus, on the date of the transfer under Section 548, the

Whitneys gave, and the Defendant received, the equity in the Property of $125,000 ($315,000 - $190,000).[9]

The Court must next determine the value of the consideration received by the Whitneys in exchange for the transfer. The Court finds and concludes that the value received by the Whitneys in exchange for the Property was $16,099.09. This total includes: (1) the $11,174.58 payment to reinstate the mortgage; (2) the $1,501.11 payment for the April, 2005, mortgage payment; (3) the $1,602 payment to the homeowners association; (4) the $1,395 payment for property taxes; and (5) the $426.40 payment for water and sewage. Although items (2) through (5) were paid by the Defendant after the initial transaction in March, 2005, the Court will include them in the analysis because these payments benefited the Whitneys.

The Court finds and concludes that the Whitneys receipt of $16,099.09 in exchange for equity in the Property valued at $125,000 does not constitute reasonably equivalent value. Under this analysis, the Whitneys received approximately 13 percent of the value of the equity in the Property in exchange for the transfer. Under no circumstances is $16,099 reasonably equivalent to $125,000.

The Defendant contends that in addition to the amounts enumerated above, the Court should also include in the amount received by the Whitneys the $3,700 recording cost incurred by the Defendant. Additionally, the Defendant maintains that the Court should also include in the amount received by the Whitneys a hypothetical cost of sale, namely, a six percent real estate brokers' fee, that the Whitneys did not incur by entering into the sale transaction with the Defendant.

---

[9] As stated supra at n. 2, the Defendant characterized the transaction as a sale of equity (although the Defendant also contended that he gave an option to repurchase to the Whitneys, which option this Court rejects).

The Court finds and concludes that including the $3,700 recording cost in the analysis is not appropriate. As stated above, Section 548 plainly requires an examination of whether "the debtor . . . received less than a reasonably equivalent value...." 11 U.S.C. §548(a)(1)(B) (emphasis added). The Court is hard pressed to find that the Whitneys received any value when the Defendant paid the cost of recording the Deed. In any event, including the $3,700 recording fee in the value received by the Whitneys would not change this Court's determination that the transfer was constructively fraudulent.

Further, the Court finds and concludes that a hypothetical real estate broker's fee should not be included in the value "received" by the Whitneys. As a matter of fact, no broker was retained and no fee was earned.[10] Further, as a matter of fact, the Whitneys never received the benefit of the services of a real estate broker which would have included, among other things, actively marketing the Property to maximize the sale price. Considering the nature of the transaction and the minimal amount of funds paid by the Defendant, the Court finds no justification for factoring into the analysis the amount the Whitneys would have paid a real estate broker in a bona fide marketing and sale transaction. The Defendant acquired the Property without marketing it or testing the market in any way; therefore the hypothetical cost of marketing the Property should not be taken into account for purposes of Section 548.

The Defendant further contends that using the fair market value of the Property to determine the value given is inappropriate in this case because the Property was on the brink of going to foreclosure. In support of this contention, the Defendant relies on BFP v. Resolution Trust Corp., 511 U.S. 531 (1994). In BFP, the Supreme Court opined that

---

[10] While Defendant contends that a real estate broker's commission should be included in the analysis, the Court notes that there would have been no need for a broker if the transaction had been, in fact, a loan as Defendant testified.

the fair market value of real property may not be an appropriate bench mark in determining reasonable equivalent value when a property is sold at a lawful mortgage foreclosure sale.  Id. at 538.

The holding in BFP is not controlling in the instant case.  As a preliminary matter, the Supreme Court in BFP expressly limited its holding to specific forced sales, namely, non-collusive mortgage foreclosure sales that are conducted in accordance with state law. Id. at 537 n3 ("We emphasize that our opinion today covers only mortgage foreclosures of real estate.  The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens for example) may be different.")  Moreover, in contrast to the facts in BFP, no foreclosure sale was conducted in the instant case.  Thus no procedural safe guards were in place to ensure that the transaction comported with state law.  More importantly, the Property was not the subject of a properly noticed auction sale at which willing buyers may have appeared to bid competitively for the Property.  Cf., BFP, 511 U.S. at 545 ("We deem, as the law has always deemed, that a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.")  In fact, the Supreme Court in BFP expressly stated "reasonably equivalent value criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context").  Id. at 545.  Thus, the holding in BFP is inapposite to this case because no foreclosure sale was in fact conducted.  Accordingly, the Court finds and concludes that "fair market value is an extremely important factor in determining reasonable equivalence."  See Morris, 914 F.2d at 466.

In addition, the Defendant never produced any evidence setting forth a value for the Property other than market value.  In fact, in his closing argument, the Defendant relied on the March, 2005, stipulated fair market value of the Property to show that the Whitneys received reasonably equivalent value for the transfer.  Moreover, there was nothing in the record to suggest that the value paid by the Defendant had anything to do with the value of the Property as perceived or understood by either the Whitneys or the Defendant.  Rather, the amount paid by the Defendant was simply the amounts needed to reinstate the loan and to pay other expenses related to the loan or the Property.  Thus in no sense can the amount paid by the Defendant be considered to result in a "market" price between a willing buyer and willing seller (no matter how much duress the Whitneys may have been under), other than perhaps by pure happenstance in comparison to extraneous evidence, such as an appraisal.  Stated otherwise, the parties neither understood nor intended that the amount paid by the Defendant was an approximation for any type of value of the Property, whether reasonably equivalent or fair market.

At bottom, the transfer of the Property to the Defendant provided him with $125,000 in equity in the Property at a cost of at most $20,000.  This transaction patently falls within the rubric of Section 548(a)(1)(B) and will be avoided.

One final note: The Defendant argues that the value he gave to the Whitneys should include the value of the deed of trust Liens on the Property of $190,000.  The Defendant would add the value of the Liens to the amount he paid and compare that sum to the market value to determine if he paid reasonable equivalent value.  Under this analysis the Defendant would have paid $206,099, comprised of (1) $190,000 of the

Liens that he took the Property subject to; and (2) $16,099 he paid to reinstate the loan and for the other expenses discussed above.[11]

The Court disagrees that the value of the Liens on the Property should be included in the value received by the Whitneys.  As noted above, Section 548 requires an examination of whether "the debtor . . . _received_ less than a reasonably equivalent value...." 11 U.S.C. §548(a)(1)(B) (emphasis added).  The Defendant did not assume the deed of trust loans but only took the Property subject to them.  The Whitneys remained liable on the deed of trust loans and continued to make payments on them after the transaction with the Defendant.  Further, as noted above, value means "…satisfaction…of a present or antecedent debt of the debtor…" 11 U.S.C. § 548(d)(2)(A).   By taking the Property subject to the Liens, the Defendant did not satisfy any present or antecedent debts of the Whitneys and thus did not give value as defined by Section 548(d)(2)(A).

Nevertheless, even under this analysis, the Court's conclusion would not change. The Whitneys would have received $206,099, as described above, in exchange for the Property valued at $315,000.  Since $206,099 is 65% of $315,000, the Court would conclude that $206,099 is not reasonably equivalent value for the transfer of the Property.

**b.  The transaction as a loan transaction.**

Treating the transaction as a loan transaction does not change this Court's conclusion that the transfer of the Property to Defendant is avoidable as a fraudulent transfer under Section 548(a)(1)(B).

---

[11] The Defendant would also include the $3700 payment to record the Deed and the hypothetical broker's commission discussed above. And, of course, the Defendant contends that the amounts should be compared to the market value of the Property as of March, 2005, rather than November, 2005. For the reasons stated above, the Court has rejected these positions.

The Whitneys signed the Note in the amount of $32,000.  The only evidence in the record to explain why the face amount of the Note was $32,000 while the Defendant only advanced $11,174.58 at the time the Note was executed was that the difference was the Defendant's "fee" for entering into the transaction. Even adding to the principal on the Note the subsequent payments made by the Defendant, as well as the $3700 for recording the Deed, the total "advanced" by the Defendant would be $19,799.09. Therefore, the Defendant's fee for making a loan of less than $20,000 was $12,000. Even if the Court were to impute a reasonable interest into the transaction, there is no justification for the $12,000 fee.

Further, on November 4, 2005, the Defendant recorded the Deed to satisfy the amount due on the Note without: (1) providing any demand to the Whitneys, notwithstanding that the Note had no maturity date; (2) providing any opportunity to cure; (3) providing the Whitneys any notice that he was going to or had recorded the Deed; (4) complying with any state law requirements for conducting a foreclosure sale; (5) actually conducting a foreclosure sale or other auction sale of the Property; and (6) acting commercially reasonable in any way.  Indeed, the Whitneys did not discover that the Deed was recorded until they attempted to refinance the Property and were told they no longer owned the Property.

The structure of the transaction, the fee charged by the Defendant and the Defendant's foregoing actions are very troubling, to say the least.  The Whitneys may well have a basis for relief under various consumer or other lending laws.  In this action, however, they seek to avoid the transaction under Section 548.  For purposes of determining whether the transaction was constructively fraudulent, it is sufficient to note

that the Defendant comes into this Court with unclean hands.  It may well be that the Defendant was somewhat unsophisticated in financial transactions.[12]  That, however, does not provide him with an excuse for the dismal, if not incomprehensible, method of documenting and executing this transaction.

For purposes of determining whether the transaction was constructively fraudulent when viewed as a loan transaction, much the same analysis applies as set forth above. The recording of the Deed by the Defendant satisfied a debt of the Whitneys (i.e., the Note held by the Defendant).  Therefore, because the balance on the Note was satisfied, the Whitneys' received "value" when the Deed was recorded. See 11 U.S.C. § 548(d)(2)(A) (value means "…satisfaction…of a present or antecedent debt of the debtor…").  The question is, whether the value given by the Whitneys was reasonably equivalent to the value they received.  As stated above, the maximum amount the Defendant advanced on the Note was $16,099 plus the $3700 recording fees, for a total of $19,799.  For the reasons stated above in the context of analyzing the transaction as a sale, $19,799 is not reasonably equivalent to the value given by the Whitneys (i.e., the value of the Property subject to the Liens).

**B.       The Defendant did not commit fraud.**

In count four of the complaint, the Plaintiffs contend that the Defendant is liable for misrepresentation and fraud.  Under this claim, the Plaintiffs seek compensatory damages in the amount of $10,000 and punitive damages in the amount of $150,000.

The Plaintiffs contend that the Defendant misrepresented the nature of the transaction.  In particular, the Plaintiffs aver that the Defendant told the Whitneys that the

---

[12] The scope of the Defendant's experience in financial matters is not clear on the record.  In answer to a specific question, he testified that he had only done one previous transaction involving a quitclaim bill of sale, a promissory note and a deed.   He testified that he was familiar with foreclosure proceedings.

transaction was nothing other than a loan transaction and that he never advised them that they were actually making an outright transfer of the Property.

In Maryland, to sustain a claim for fraud or deceit a party must show: (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. Ellerin v. Fairfax Sav., F.S.B., 337 Md. 216, 229 (Md. 1995); Nails v. S&R, Inc., 334 Md. 398, 415-416 (Md. 1994).  A defendant's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the "actual malice" required for the availability of punitive damages.  Ellerin, 337 Md. At 240.

Considering the demeanor and the credibility of the witnesses and the evidence presented at the trial, the Court finds and concludes that the Defendant did not commit fraud.  First, the discussion between the Defendants and the Whitneys on the eve of the transaction was brief and the record is not clear on the nature of that conversation.  Second, the Defendant left overnight with the Whitneys unsigned documents that they would be required to sign for the transaction.  Those documents included a deed and bill of sale that were absolute on their face.  Third, the Whitneys signed the Deed, a quitclaim deed and bill of sale, all of which stated that they were transferring the Property and none of which indicated that the Property served merely as collateral security for a loan. Fourth, the Defendant waited until November, 2005, to record the Deed.  Fifth, as

described above in Section A, the documents themselves were inconsistent and illogical on their face as to be practically incomprehensible. Under these circumstances, the Court finds and concludes that the Defendant did not make a false representation to the Whitneys with the intent to deceive or defraud the Whitneys and upon which they reasonably relied. To be sure, it may be that the Defendant did not know what he was doing, but the Court determines that he did not commit fraud.

## CONCLUSION

For the reasons stated above, the Court will enter an order avoiding the transfer of the Property.

Copies to:

 Plaintiffs
 Plaintiffs' Counsel
 Defendant
 Defendant's Counsel
 Trustee
 Office of the U.S. Trustee

## END OF ORDER